Approved: *Thomas John Wright*
THOMAS JOHN WRIGHT
Assistant United States Attorney

Before:  THE HONORABLE ONA T. WANG
         United States Magistrate Judge
         Southern District of New York

- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

- v. -

JOSEPH GALDIERI, Sr., and
JOSEPH GALDIERI, Jr.

                Defendants.

- - - - - - - - - - - - - - - x

**SEALED COMPLAINT**

Violations of 18 U.S.C. §§ 922(g), 922(k), 924(c), and 2, and 21 U.S.C. § 846

COUNTY OF OFFENSE: BRONX

**19MAG 8842**

SOUTHERN DISTRICT OF NEW YORK, ss.:

KAREN ALTIERI, being duly sworn, deposes and says that she is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

**COUNT ONE**

(Felon in Possession of a Firearm)

1. From at least in or about July 2019 up to and including on or about August 8, 2019, in the Southern District of New York and elsewhere, JOSEPH GALDIERI, Sr. and JOSEPH GALDIERI, Jr., the defendants, each knowing that he had been convicted in a court of a crime punishable by imprisonment for a term exceeding one year, knowingly did possess a firearm, to wit, a nine-millimeter Ruger semi-automatic pistol, and the firearm was in and affecting interstate and foreign commerce.

(Title 18, United States Code, Sections 922(g)(1) and 2.)

**COUNT TWO**

(Possession of a Defaced Firearm)

2. From at least in or about July 2019 up to and including on or about August 8, 2019, in the Southern District

of New York and elsewhere, JOSEPH GALDIERI, Sr. and JOSEPH
GALDIERI, Jr., the defendants, knowingly did possess and receive
a firearm which had the importer's and manufacturer's serial
number removed, obliterated, and altered, to wit, a defaced
nine-millimeter Ruger semi-automatic pistol, which had
previously been shipped and transported in interstate and
foreign commerce.

(Title 18, United States Code, Sections 922(k) and 2.)

**COUNT THREE**

(Use, Carrying, and Possession of a Firearm)

3. From at least in or about July 2019 up to and
including on or about August 8, 2019, in the Southern District
of New York and elsewhere, JOSEPH GALDIERI, Sr. and JOSEPH
GALDIERI, Jr., the defendants, during and in relation to a drug
trafficking crime for which they may be prosecuted in a court of
the United States, namely, the marihuana conspiracy charged in
Count Four of this Complaint, knowingly did use and carry a
firearm, and in furtherance of such crime, did possess a
firearm, to wit, a nine-millimeter Ruger semi-automatic pistol.

(Title 18, United States Code,
Sections 924(c)(1)(A)(i) and 2.)

**COUNT FOUR**

(Marihuana Conspiracy)

4. From at least in or about July 2019 up to and
including on or about August 8, 2019, in the Southern District
of New York and elsewhere, JOSEPH GALDIERI, Sr. and JOSEPH
GALDIERI, Jr., the defendants, and others known and unknown,
intentionally and knowingly did combine, conspire, confederate,
and agree together and with each other to violate the controlled
substances laws of the United States.

5. It was part and an object of the conspiracy that
JOSEPH GALDIERI, Sr. and JOSEPH GALDIERI, Jr., the defendants,
and others known and unknown, would and did distribute and
possess with intent to distribute a controlled substance, in
violation of Title 21, United States Code, Section 841(a)(1).

6. The controlled substance that JOSEPH GALDIERI, Sr. and
JOSEPH GALDIERI, Jr., the defendants, conspired to distribute
and possess with intent to distribute was less than 50 kilograms

2

of marihuana, in violation of Title 21, United States Code, Section 841(b)(1)(D).

(Title 21, United States Code, Section 846.)

7. The bases for my knowledge and for the foregoing charges are, in part, described in the following paragraphs.

8. I have served for approximately 10 years in the FBI, and I have been personally involved in the investigation of this matter. This affidavit is based upon my personal participation in the investigation of this matter, my conversations with law-enforcement officers and other individuals, as well as my examination of reports and other records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported in this Complaint, they are reported in substance and part, except where otherwise indicated.

9. Based on my training and experience, my conversations with law-enforcement officers and other individuals, my review of certain communications intercepted pursuant to a wiretap order authorizing the interception of communications transmitted over the cellular telephones assigned telephone numbers 914-433-7857 (the "7857 Number") and 845-608-3741 (the "3741 Number"), my review of certain draft transcripts of those same communications, my review of certain video recordings from a system of surveillance cameras, my review of certain cellular telephone subscriber information, and my knowledge of certain physical surveillance, I have learned the following information about certain specific events leading up to on or about August 8, 2019. In particular:

a. On or about July 24, 2019 at approximately 12:25 PM, an unidentified male ("Co-Conspirator-1" or "CC-1") used a cellular telephone assigned telephone number 701-412-8522 (the "8522" Number") to call the 3741 Number and participated in a conversation with JOSEPH GALDIERI, Jr., the defendant.[1] After CC-1 asked, "What exactly is the plan, brother?" CC-1 thereafter specified, "The money, when's it gonna be in my hand?" After GALDIERI, Jr. asked, "Where would you like it to go tomorrow?"

---

[1] For the reasons described in ¶¶ 9.a.i and 9.d, infra, I believe GALDIERI, Jr. is the user of the 3741 Number on or about July 24, 2019 and on all subsequent occasions referenced in this Complaint.

3

CC-1 stated, "It's gonna have to come to Humboldt, brother." Thereafter, GALDIERI, Jr. stated, "I will get further exact time to you in a little bit. I was actually waiting on him, he was gonna come to my office. I literally called him, he was, like, getting out of bed. . . . So he's on his way here now."

        i.     Based on my involvement in this investigation, I am aware that GALDIERI, Jr. works at Pocket Aces Beverages, a business that his father, JOSEPH GALDIERI, Sr., the defendant, operates, that distributes certain bottled and canned beverages, and that is based in a warehouse located at 1633 Stillwell Avenue, Bronx, New York 10461 (the "Warehouse"). The Warehouse, which has two loading docks facing Stillwell Avenue, a north loading dock and a south loading dock, also contains an enclosed office located inside and at the rear of the Warehouse (the "Office").

        ii.    Based on my review of certain video recordings from the system of surveillance cameras installed at the Warehouse, I know that at approximately the same time as this call was intercepted, a video recording from a surveillance camera located inside the Office of the Warehouse depicts GALDIERI, Jr., who was sitting in a chair at a desk in the Office (the "Desk"), answer a cellular telephone, which he placed up to his ear and held there for the approximate duration of this call. For this reason, I believe that GALDIERI, Jr.'s references to "my office" and "on his way here" refer to the Warehouse and the Office.

        iii.   Based on my review of this same video recording, I know further that during the entire time that GALDIERI, Jr. held the cellular telephone to his ear and participated in this call, GALDIERI, Sr. was also present in the Office, pacing beside GALDIERI, Jr. for the duration of the call.

        iv.    Based on my training and experience, I am familiar with Humboldt County, California, which is a county located in the north of that state and a popular location for the wholesale cultivation of marihuana.

        v.     Based on my training and experience and work on this investigation, including my review of other intercepted communications detailed here, I believe that CC-1 is a marihuana distributor based in Humboldt County, California who supplies GALDIERI, Jr. with marihuana.

    b.    A short time later, on or about July 24, 2019 at approximately 1:52 PM, GALDIERI, Jr. used the 7857

4

Number to call a cellular telephone assigned telephone number 216-203-6005 and participated in a conversation with another unidentified male ("Co-Conspirator-2" or "CC-2").[2] After GALDIERI, Jr. stated, "I'll be here all day, but the sooner the better, the kid's coming here soon," CC-2 responded in relevant part, "The who comes here?" to which GALDIERI, Jr. replied, "One of my boys coming to my place . . . I'm giving him the money for the B-O-Ks."

                            i.     Based on my training and experience, I am familiar with "B-O-K," a common acronym in the context of marihuana trafficking for "Blood Orange Kush," a strain of marihuana that is cultivated in Humboldt County, California.

                            ii.    Based on my review of certain video recordings from the system of surveillance cameras installed at the Warehouse, I know that at approximately the same time as this call was intercepted, a video recording from a surveillance camera located inside the Office of the Warehouse depicts GALDIERI, Jr. using a cellular telephone, from which I believe that GALDIERI, Jr.'s reference to "my place" refers to the Warehouse.

                            iii.   Based on my training and experience and work on this investigation, including my review of other intercepted communications detailed here, I believe that CC-2 owed money to GALDIERI, Jr. for a prior delivery or future order of marihuana, which money GALDIERI, Jr. intended to use to pay for a shipment of marihuana, in particular a shipment of Blood Orange Kush from Humboldt County, California.

                c.     Thereafter, on or about July 24, 2019 at approximately 6:55 PM, a video recording from the surveillance camera located inside the Office of the WAREHOUSE depicts GALDIERI, Jr. and a further unidentified Asian male ("Co-Conspirator-3" or "CC-3") walk into the Office. A video recording from another surveillance camera located inside a room accessible from the Office (the "Room"), shortly thereafter depicts GALDIERI, Jr. walk into the Room, pick up a large quantity of paper currency from the vicinity of an area where on or about August 8, 2019 I saw a safe, and walk back into the

---

[2] For the reasons described in ¶ 9.b.ii, infra, I believe GALDIERI, Jr. is the user of the 7857 Number on or about July 24, 2019 for multiple reasons. In addition, the 7857 Number is subscribed to in the name of "Joseph Galdieri" with a subscriber address in Rockland County, New York at which JOSEPH GALDIERI, Jr. resides.

Office. During the next approximately one hour, the video recordings from the surveillance cameras located inside the Office and the Room depict GALDIERI, Jr. and CC-3 both using a money-counting machine to count numerous large stacks of paper currency that GALDIERI, Jr. removed from the Room and placed on the Desk. Eventually, the video recordings show GALDIERI, Jr. and CC-3 place the counted paper currency, having been rubber-banded together in multiple bundles, into a cardboard box, which video recordings from other surveillance cameras located in the Warehouse show CC-3 place in a car that he drives away from the Warehouse.

    i. Based on my training and experience and work on this investigation, including my review of other intercepted communications detailed here, I believe that CC-3 and GALDIERI, Jr. met in the Office of the Warehouse on or about July 24, 2019 for CC-3 to collect the counted paper currency for eventual delivery to CC-1 in exchange for a shipment of marihuana, in particular a shipment of Blood Orange Kush from Humboldt County, California.

  d. During this same time period in which GALDIERI, Jr. and CC-3 are counting and packaging a large quantity of paper currency in the Office of the Warehouse, on or about July 24, 2019 at approximately 7:48 PM, a further unidentified male ("Co-Conspirator-4" or "CC-4") using a cellular telephone assigned telephone number 845-304-5908 called the 3741 Number and participated in a conversation with GALDIERI, Jr. After CC-4 stated, "Yo what were the other flavors you had over there, those other shits you had, those other brands?" GALDIERI, Jr. stated, "I had danks . . . and I had moon rock hearts." Later in the conversation, after CC-4 stated, "What are you doing, are you counting bread?" GALIDIERI, Jr. responded, "Yeah, how did you know?" to which CC-4 replied, "I love that sound."

    i. Based on my training and experience, I am familiar with "dank" and "moon rock heart," common terms in the context of marihuana trafficking for potent or high-quality marihuana and a bud of a cannabis plant further processed to result in potent marihuana, respectively.

    ii. Based on my review of certain video recordings from the system of surveillance cameras installed at the Warehouse, I know that at approximately the same time as this call was intercepted, a video recording from a surveillance camera located inside the Office of the Warehouse depicts GALDIERI, Jr. using a cellular telephone, sitting at the

6

Desk, and using a money-counting machine, as described in ¶ 9.c, supra.

      iii. Based on my training and experience, I am familiar with "bread," a common term in popular slang in general and in particular in the context of drug trafficking for money.

      iv. Based on my training and experience, I am familiar with the use of money-counting machines in general and in particular in the context of drug trafficking, and am further familiar with the distinct whir of money-counting machines when in use with large quantities of paper currency.

    e. The following day, on or about July 25, 2019 at approximately 11:09 PM, GALDIERI, Jr. used the 3741 Number to call the 8522 Number and participated in a conversation with CC-1. At the start of that conversation, GALDIERI, Jr. stated, "I just spoke to my buddy. He said [ ] send him or just send me an address and he'll have it delivered in Sacramento tomorrow. But we gotta give whoever it is 500 bucks and obviously, there only 150 on there, so if you wanna just, fucking, I'll quick pay you 500 bucks or whatever just to give to the guy. Whoever is delivering it. If that's ok with you? Or just take it out of [ ] the 150, I'll just give it to you next time, either or?" In response, CC-1 stated, "Okay, that's fine."

      i. Based on my training and experience, I am familiar with Sacramento, California, a city that is located in the vicinity of Humboldt County, California.

      ii. Based on my training and experience and work on this investigation, including my review of other intercepted communications detailed here, I believe that "my buddy" refers to CC-3, "150" refers to $150,000 or the amount of counted paper currency that CC-3 collected for eventual delivery to CC-1 in exchange for a delivery of marihuana, and "500 bucks" refers to a fee due upon delivery of the $150,000 for which GALDIERI, Jr. is responsible.

    f. The following day, on or about July 26, 2019 at approximately 7:21 AM, a video recording from the surveillance camera located inside the Office of the Warehouse depicts GALDIERI, Jr. walk into the Office, sit down at the Desk, open the top drawer on the right side of the Desk, pull out a dark-colored handgun consistent in its appearance with the Firearm, as defined in ¶ 10.c, infra, and promptly return the dark-colored handgun to the same drawer.

7

i. Based on my review of certain video recordings from the system of surveillance cameras installed at the Warehouse, I have not identified any video recording from the surveillance camera located inside the Office of the Warehouse depicting the removal of this dark-colored handgun from the top drawer on the right side of the Desk between on or about July 26, 2019 and on or about August 8, 2019.

ii. As detailed in ¶ 10.c, infra, on or about August 8, 2019, an investigator of the New York State Police seized the Firearm, as defined in ¶ 10.c, infra, from the top drawer on the right side of the Desk.

g. Later that same day, on or about July 26, 2019 at approximately 6:56 PM, CC-1 used the 8522 Number to call the 3741 Number and participated in a conversation with GALDIERI, Jr. After GALDIERI, Jr. stated, "This dumb ass kid is saying that if he don't have an address he can't go anywhere. Can you give me [ ] an [ ] address to [ ] whereabout so I can send it to this moron?" CC-1 stated, "What a fucking dumb fuck." Thereafter, GALDIERI, Jr. stated, "Yeah, tell me about it, I fucking, I'm dealing with Asian morons, bro, and I fucking paid. Yo, you know what I paid to get that money out there? 67-50. Six thousand, seven hundred[, and] fifty dollars to get the money over there, and a hundred fifty thousand dollars of my money is just fucking sitting in LA." Thereafter, CC-1 quoted an address located in Sacramento, California to GALDIERI, Jr.

i. Based on my training and experience and work on this investigation, including my review of other intercepted communications detailed here, I believe "Asian morons" refers to CC-3 and one or more associates of CC-3, "[s]ix thousand, seven hundred[, and] fifty dollars" refers to the fee that GALDIERI, Jr. paid to CC-3 for delivery of the counted paper currency to CC-1, and "a hundred fifty thousand dollars" refers to the amount of that counted paper currency.

h. A short time later, on or about July 26, 2019 at approximately 8:09 PM, CC-1 used the 8522 Number to call the 3741 Number and participated in a conversation with GALDIERI, Jr. After CC-1 stated, "If it doesn't come there today, it looks like it's gonna have to drive all the way up here," GALDIERI, Jr. responded, "Okay, so that's what I gotta tell him," to which CC-1 replied, "As long as it does, that's fine, but I need it . . . here this weekend, brother." Thereafter, CC-1 stated, "You should [ ] when my boy brings it to you, you should try to send some back with him." In response, GALDIERI, Jr. stated, "Okay," CC-1 responded, "Yeah, I

8

would," and GALDIERI, Jr. replied, "I didn't know that was possible." After CC-1 then stated, "It is very possible," GALDIERI, Jr. responded, "Okay, I'll keep that in mind then for sure," to which CC-1 replied, "It just makes it a lot easier, cuz he drops everything off to me and [ ] I just do it again, send it out, boom, fucking easy." After GALDIERI, Jr. then stated, "Burn and turn, exactly," CC-1 responded, "I'll make it hella easy," to which GALDIERI, Jr. replied, "Always keep it in circulation, okay, alright, let me call him now and tell him that if it's not today, it has to be in Humboldt, right?" to which CC-1 further replied, "Yeah."

    i. Based on my training and experience and work on this investigation, including my review of other intercepted communications detailed here, I believe "all the way up here" refers to the location of CC-1 in Humboldt County, California, which is located north of Sacramento, California.

    ii. Based on my training and experience, I am familiar with the practice of drug traffickers paying a cash security deposit at the time of delivery of a quantity of drugs toward payment of the purchase price of an anticipated future delivery of another quantity of drugs, a practice that particularly between established distributers of drugs who are physically distant from one another can obviate the requirement for a drug supplier to possess in hand the entirety of the purchase price for that anticipated future delivery before initiating its shipment, thereby materially facilitating the pace at which transactions can be conducted in an illegal industry in which cash transactions predominate.

    iii. Based on my training and experience and work on this investigation, including my review of other intercepted communications detailed here, I believe "my boy" refers to an associate of CC-1 who is expected to deliver the shipment of marihuana to GALDIERI, Jr. and "send some back with him" refers to such a cash security deposit paid at the time of delivery of a quantity of drugs toward payment of the purchase price of an anticipated future delivery of another quantity of drugs.

    i. Thereafter, on or about July 29, 2019 at approximately 1:28 PM, CC-1 used the 8522 Number to call the 3741 Number and participated in a conversation with GALDIERI, Jr. After CC-1 stated, "So when this stuff comes out east, where do you want it to go over there?" GALDIERI, Jr. stated, "I was hoping to my business, he can pull right in where all my other vans are and I'll fucking [ ] you know, I'll close down

9

the watchama call it." After CC-1 stated, "Is it like a semi trailer can get in there or what?" GALDIERI, Jr. responded, "Yeah, a hundred percent," to which CC-1 replied, "Okay, I need that address." After CC-1 acquired a pencil and stated, "I'm ready now," GALDIERI, Jr. stated, "Alright 1633 . . . Stillwell S-T-I-L-L-W-E-L-L . . . that's a Stillwell Avenue in Bronx New York B-R-O-N-X 10461."

          i.    Based on my training and experience and work on this investigation, including my review of other intercepted communications detailed here, I believe "this stuff" refers to a shipment of marihuana from CC-1 in Humboldt County, California, which GALDIERI, Jr. directs to be delivered to the Warehouse.

          j.    Approximately one week later, on or about August 6, 2019 at approximately 10:24 PM, CC-1 used the 8522 Number to call the 3741 Number and participated in a conversation with GALDIERI, Jr. After CC-1 stated, "What are you up to tomorrow?" GALDIERI, Jr. responded, "I'm free all day," to which CC-1 replied, "It's gonna show up, I'm talking to him right now, I can be there tomorrow between twelve and four." After GALDIERI, Jr. stated, "Same addee I gave you?" CC-1 responded, "Yeah . . . everything is good." After CC-1 thereafter stated, "The truck can pull in there, right?" GALDIERI, Jr. responded, "Absolutely," before proceeding to state, "I got a forklift and everything, so I'm just gonna take it off with the forklift." After CC-1 thereafter stated, "He'll be in a white truck," GALDIERI, Jr. responded, "Okay, and I got to give him the twenty when I see him or . . . ?" to which CC-1 replied, "Yeah," to which GALDIERI, Jr. further replied, "Okay, cool, I got it."

          i.    Based on my training and experience and work on this investigation, including my review of other intercepted communications detailed here, I believe "same addee I gave you" refers to the address of the Warehouse that GALDIERI, Jr. previously specified for delivery of the shipment of marihuana, "white truck" refers to the vehicle that the associate of CC-1 who was delivering the shipment of marihuana would drive to deliver the shipment of marihuana, and "the twenty" refers to the cash security deposit that GALDIERI, Jr. had decided to pay to this associate of CC-1, which is referenced in ¶ 9.h, supra, most likely a cash security deposit of $20,000.

          k.    The next day, on or about August 7, 2019, I conducted physical surveillance together with other law-

enforcement officers in the vicinity of the Warehouse; however, a white truck did not arrive at the Warehouse.

    1. Thereafter, on or about August 8, 2019, the 8522 Number, which I previously associated with CC-1, and the 3741 Number, which I previously associated with GALDIERI, Jr., participated in an exchange of text messages. In particular, on or about August 8, 2019 at approximately 1:44 AM, the 8522 Number texted, "He will be there early as u want. He's parked close by already." Thereafter, on or about August 8, 2019 at approximately 2:05 AM, the 8522 Number texted, "7am works. He's there. White truck." A short time later, on or about August 8, 2019 at approximately 5:24 AM, the 3741 Number texted, "Ok sounds good. Wil be there the." Finally, a moment later, on or about August 8, 2019 at approximately 5:24 AM, the 3741 Number texted, "Then."

  10. Based on my training and experience, my conversations with law-enforcement officers and other individuals, my review of certain video recordings from a system of surveillance cameras, my review of certain pen-register data for the 3741 Number, my review of certain subscriber information for cellular telephones, my knowledge of certain physical surveillance, and my review of certain physical evidence, I have learned the following information about certain specific events on or about August 8, 2019:

    a. Based on my review of certain video recordings from on or about August 8, 2019 from the system of surveillance cameras installed at the Warehouse and my review of certain pen-register data for the 3741 Number, I have learned the following information:

      i. At approximately 6:49 AM, a video recording from the surveillance camera trained on the north loading dock and exterior of the Warehouse depicts a white tractor trailer truck (the "White Truck") arrive on Stillwell Avenue and park along Stillwell Avenue to the north of the Warehouse and on the same side of Stillwell Avenue as the Warehouse.

      ii. At approximately 7:08 AM, a video recording from the surveillance camera trained on the north loading dock and exterior of the Warehouse depicts JOSEPH GALDIERI, Sr., the defendant, walk into the Warehouse.

      iii. At approximately 7:09 AM, a video recording from the surveillance camera located inside the Office depicts GALDIERI, Sr. open the top drawer on the right side of

the Desk and remove from that drawer a pair of glasses, which he proceeds to wear.

      iv.  At approximately 7:18 AM, a video recording from the surveillance camera trained on the north loading dock and exterior of the Warehouse depicts an unidentified male ("Co-Conspirator-5" or "CC-5") step out of the passenger side of the cab of the White Truck, walk up to the Warehouse, and outside the Warehouse approach GALDIERI, Sr., who has walked out of the Warehouse at approximately the same time. After a brief face-to-face interaction between CC-5 and GALDIERI, Sr., the same video recording shows CC-5 and GALDIERI, Sr. walk down Stillwell Avenue toward the White Truck, before GALDIERI, Sr. walks back down Stillwell Avenue and back into the Warehouse at approximately 7:27 AM.

      v.  During this same time period that CC-5 and GALDIERI, Sr. are both outside the Warehouse, I know that at approximately 7:25 AM and 7:26 AM, the 3741 Number, which I previously associated with JOSEPH GALDIERI, Jr., the defendant, placed two calls to a cellular telephone assigned the telephone number 917-731-0688 (the "0688 Number"), which lasted approximately 25 seconds and 16 seconds, respectively. At approximately the same time as both of these two calls, video recordings from surveillance cameras located in the exterior of the Warehouse depict GALDIERI, Sr. using a cellular telephone. Finally, the 0688 Number is subscribed to in the name of "Joseph Galdieri" with a subscriber address in Rockland County, New York at which GALDIERI, Sr. resides.

      vi.  At approximately 7:28 AM, just after these two calls and just after GALDIERI, Sr. walks into the Warehouse, a video recording from the surveillance camera located in the Office of the Warehouse depicts GALDIERI, Sr. walk into the Office. A video recording from another surveillance camera located inside the Room shortly thereafter depicts GALDIERI, Sr. walk into the Room, pick up a large quantity of paper currency from the vicinity of an area where later on or about August 8, 2019 I saw a safe, and walk back into the Office. Back in the Office, the video recording from the surveillance camera located in the Office depicts GALDIERI, Sr. place the paper currency down on the Desk, retrieve a black plastic bag, and place the paper currency inside the black plastic bag.

      vii.  At approximately 7:30 AM, the video recording from the surveillance camera trained on the north loading dock and exterior of the Warehouse depicts GALDIERI, Sr. walk out of the Warehouse and hand the black

plastic bag to CC-5, who then signals to the White Truck with his hand, after which the White Truck drives down Stillwell Avenue toward the Warehouse.

        viii.    At approximately 7:39 AM, a video recording from the surveillance camera trained on the south loading dock and exterior of the Warehouse depicts a further face-to-face interaction between CC-5 and GALDIERI, Sr. who gestures toward a forklift with his hand, after which CC-5 walks up to the White Truck and appears to enter its tractor-trailer compartment. At this time, a fork lift, which an unidentified male walks out of the warehouse to operate, approaches the White Truck and is loaded with multiple boxes from the White Truck.

        ix.    At approximately 7:43 AM, video recordings from surveillance cameras located in the exterior and the interior of the Warehouse depict the fork lift drive from the White Truck and into the Warehouse through the south loading dock, carrying what are identifiable as multiple boxes bearing the distinct logo of a shipping company.

        x.    At approximately 7:45 AM, the video recordings from the surveillance camera trained on the north and south loading docks and exterior of the Warehouse depict CC-5, who had walked back into the Warehouse, and GALDIERI, Sr. walk out together from the Warehouse at which point CC-5 walks toward the White Truck, which soon thereafter drives away down Stillwell Avenue.

        xi.    At approximately 8:00 AM, video recordings from the surveillance cameras located in the exterior and the interior of the Warehouse depict GALDIERI, Jr. park a sport-utility vehicle (the "SUV") in the vicinity of the front of the Warehouse and thereafter walk into the Warehouse.

        xii.    At approximately 8:25 AM, after the video recordings from the surveillance cameras located in the Office and elsewhere in the Warehouse depict GALDIERI, Jr. walk into the Office, work at a desktop computer atop the Desk, and walk back out of the Warehouse, at which point he backs the SUV into the south loading dock of the Warehouse.

        xiii.    At approximately 8:46 AM, the video recording from the surveillance camera trained on the south loading dock and the exterior of the Warehouse depicts GALDIERI, Jr. drive away the SUV down Stillwell Avenue.

        xiv.    At approximately 9:43 AM, the video recording from the surveillance camera located in the

Office depicts GALDIERI, Sr., who is seated at the Desk, again open the top drawer on the right side of the Desk, inside of which a dark-colored handgun consistent in its appearance with the Firearm, defined in ¶ 10.c, infra, is visible. After GALDIERI, Sr. removes a pair of scissors from the same drawer, he proceeds to return them to the drawer, placing them directly on top of the dark-colored handgun.

        b.    After GALDIERI, Jr. drove the SUV away from the Warehouse, later in the morning on or about August 8, 2019, a group of law-enforcement officers were conducting physical surveillance with the aid of geographic location information for the 3741 Number and intercepted the SUV and GALDIERI, Jr., who was still driving the SUV, in the vicinity of the address in Rockland County, New York at which he resides. There, on or about August 8, 2019, the law-enforcement officers executed a warrant authorizing the search of the SUV and the person of GALDIERI, Jr. Inside the SUV, the law-enforcement officers found approximately 11 boxes bearing the distinct logo of a shipping company and containing a green, leafy substance, which they weighed at approximately 90 pounds and which, based on my training and experience in the identification of drugs, I believe is marihuana.[3]

        c.    After GALDIERI, Jr. drove the SUV away from the Warehouse, later in the morning on or about August 8, 2019, another group of law-enforcement officers and I were conducting physical surveillance in the vicinity of the Warehouse and executed a warrant authorizing the search of the Warehouse. Inside the Warehouse, an investigator of the New York State Police ("Officer-1") saw GALDIERI, Sr. inside the Office through a window built into the Office, which opens onto the interior of the Warehouse. Inside the Office, Officer-1 found inside the top drawer on the right side of the Desk, among other things, a nine-millimeter Ruger semi-automatic pistol (the "Firearm"). In addition to the Firearm, which was loaded with six nine-millimeter cartridges, the law-enforcement officers and I also seized five .380-caliber cartridges and one .45-caliber cartridge. In addition, in the second-from-top drawer on the right side of the Desk, law-enforcement officers found more than $10,000. Elsewhere in the Office, law-enforcement officers found a bucket in the rear of the Office containing a green, leafy substance, which they weighed at approximately two pounds. Further, law-enforcement officers found a tool chest in the rear of the Office containing a green, leafy substance, which they

---

[3] Before serving in the FBI as a Special Agent, for approximately seven years, I worked in the Drug Enforcement Administration as a Forensic Chemist, working on a daily basis to identify drugs.

weighed at approximately five grams. Based on my training and experience in the identification of drugs, I believe these green, leafy substances are also marihuana. Finally, law-enforcement officers seized a digital video recorder to which a system of surveillance cameras located in the Warehouse was connected (the "Digital Video Recorder").

11. Thereafter, on or about August 19, 2019, law-enforcement officers executed a further warrant authorizing the search of the Digital Video Recorder.

    a. The video recordings extracted from the Digital Video Recorder are the video recordings from the surveillance cameras located at the Warehouse, which I have referenced in this Complaint.

    b. Based on my review of certain video recordings from this system of surveillance cameras from the Warehouse, I know that the surveillance camera located in the Office depicts JOSEPH GALDIERI, Sr., the defendant, sitting and working on multiple occasions at the Desk in the days leading up to August 8, 2019 and on that day itself.

    c. Based on my review of certain video recordings from this system of surveillance cameras from the Warehouse, I know that the surveillance camera located in the Office depicts JOSEPH GALDIERI, Jr., the defendant, sitting and working on multiple occasions at the Desk on or about July 24, 2019 and in the days leading up to August 8, 2019 and on that day itself.

12. Based on my review of the Firearm, I know that its serial number, which is located prominently above its handgrip, is defaced insofar as that serial number is scraped off and entirely illegible.

13. As part of my investigation of this matter, I have received information from a special agent of the Alcohol, Tobacco, Firearms, and Explosives Bureau ("ATF"), who, based on the special agent's expertise in the manufacturing of firearms and analysis of documents relating to the Firearm, including photographs of the Firearm, concludes that the Firearm was not manufactured in the State of New York.

14. I have reviewed the criminal history of JOSEPH GALDIERI, Sr., the defendant, and identified that he was convicted in the Supreme Court of the State of New York, Bronx County on or about January 24, 2013 of Assault in the Second Degree, in violation of New York Penal Law Section 120.05(1).

Based on my training and experience, I am aware that this offense is a crime punishable by a term of imprisonment exceeding one year.

15. I have reviewed the criminal history of JOSEPH GALDIERI, Jr., the defendant, and identified that he was convicted in the County Court of the State of New York, Rockland County on or about May 18, 2016 of Criminal Possession of a Controlled Substance in the Third Degree, in violation of New York Penal Law Section 220.16(1). Based on my training and experience, I am aware that this offense is a crime punishable by a term of imprisonment exceeding one year.

WHEREFORE, deponent respectfully requests that arrest warrants be issued for JOSEPH GALDIERI, Sr. and JOSEPH GALDIERI, Jr., the defendants, and that they be arrested, and imprisoned or bailed, as the case may be.

*Karen Altieri*
KAREN ALTIERI
Special Agent
Federal Bureau of Investigation

Sworn to before me this
19th day of September, 2019

THE HONORABLE ONA T. WANG
United States Magistrate Judge
Southern District of New York